Olivier A. Beabeau (#020986)
Grant H. Frazier (#035535)
GALBUT BEABEAU, P.C.
6720 N. Scottsdale Road, Suite 305
Scottsdale, Arizona 85253
Phone:   602.955.1455
docket@gb.law

Leonard Weintraub, *pro hac vice* to be filed
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
lw@pwlawyers.com
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J.P. Morgan Securities LLC, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| vs. | **(Injunctive Relief)** |
| Brian T. Armstrong and Samira Arikat, a married couple, | |
| Defendants. | |

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendants Brian T. Armstrong ("Armstrong") and Samira Arikat ("Arikat") (collectively, "Defendants").

## PRELIMINARY STATEMENT

1.      This action is for a temporary restraining order and a preliminary injunction to maintain the *status quo* pending resolution of an arbitration proceeding between JPMorgan and Defendants that concurrently is being filed with FINRA Dispute Resolution.[1]

_____

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. Pursuant to Rule 13200 of the FINRA Code of Arbitration Procedure for

2.    This action arises from Defendants' sudden, coordinated resignations from JPMorgan on June 15, 2022, their immediate commencement of employment with Wells Fargo, a direct competitor of JPMorgan, their solicitation of JPMorgan clients to transfer their accounts from JPMorgan to Wells Fargo – in violation of their post-termination of employment contractual obligations to JPMorgan – and, on information and belief, their taking or retaining, and using, of JPMorgan's confidential and proprietary client and business information and trade secrets ("JPMorgan's Confidential and Proprietary Information"), including client contact information, in aid of their improper scheme to spirit away JPMorgan's clients.

### Defendants' Resignations

3.    On June 15, 2022, Defendants, without warning, engaged in a coordinated resignation from JPMorgan and immediately commenced employment with Wells Fargo. At the time of their resignations, Defendants, both JPMorgan Private Client Advisors, worked as a team at JPMorgan, working in two bank branch offices of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Scottsdale, Arizona. Armstrong and Arikat now work out of the same Wells Fargo office in Scottsdale, Arizona, under the dba "Arikat-Armstrong," each with the title: "Private Wealth Financial Advisor Managing Director – Investments."   While at JPMorgan, Armstrong and Arikat had worked with two JPMorgan Private Client Bankers, Catherine Esparza ("Esparza") and Michael G. Rosson, Jr. ("Rosson"), and with a JPMorgan Private Client Investment Associate, Beth J. Michele ("Michele"), who all also suddenly resigned and commenced employment at Wells Fargo with Armstrong and Arikat on June 15, 2022.

4.    In connection with their employment with JPMorgan, Defendants each entered into an agreement that contains post-termination of employment restrictive

Industry Disputes, the parties to this action are required to arbitrate disputes they have with each other before a panel of arbitrators appointed by FINRA, but JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of the arbitration pursuant to Rule 13804.

covenants prohibiting Defendants from soliciting JPMorgan's clients and employees for a one-year period after the termination of their employment, and requiring them to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.

5.     JPMorgan has learned that after resigning from JPMorgan and joining Wells Fargo, Defendants have been aggressively soliciting JPMorgan clients to move their accounts from JPMorgan to Wells Fargo, where Defendants would be responsible for servicing them, earning significant compensation for those efforts.  JPMorgan has learned that Defendants are soliciting many of the JPMorgan clients by calling them on the clients' personal cell phones.   These clients have informed JPMorgan that Defendants' communications have not been simply to announce their change of employment, but rather, they are actively attempting to induce the clients to do business with them at Wells Fargo.

6.     Numerous JPMorgan clients have informed JPMorgan that, in the weeks before and after they resigned, they received calls from Defendants on the clients' personal cell phones during which Defendants provided their personal cell phone numbers, requested meetings with the clients or otherwise attempted to induce them to transfer their accounts to them at Wells Fargo.  The clients reported that Defendants told the clients that they can offer purportedly lower fees, as well as different and superior services and products, at Wells Fargo.

7.     One JPMorgan client informed JPMorgan that she felt uncomfortable when Armstrong contacted her and attempted to solicit her business because Armstrong was very "assertive" and "aggressive."   The client further indicated that Armstrong informed the client that Wells Fargo has a better platform for affluent clients, and more and better capabilities to service complex clients, specifically touting its trust services, stating that JPMorgan cannot offer the same services that he can at Wells Fargo.  The client indicated

that Armstrong expressly asked to meet with him at Wells Fargo. The client declined Armstrong's offer.

8. Another JPMorgan client indicated that she received multiple calls from Armstrong in which he sought to convince the client to transfer her assets to him at Wells Fargo. During the calls, the client indicated that Armstrong told the client that he could offer corporate trustee services at Wells Fargo that the client had wanted, but could not get, while at JPMorgan.

9. Another JPMorgan client indicated that he received a call from Arikat, who told him it would be in his best interest to move his account to Wells Fargo. The client reported that Arikat stated that Wells Fargo would incentivize him to move by offering him lower fees and a higher borrowing cap under Wells Fargo's Securities-Based Lending program, which was something the client had requested from JPMorgan prior to Arikat's departure.

10. Further, several JPMorgan clients informed the firm that they were made aware of Defendants' planned resignations from JPMorgan prior to the actual resignations, and that, while Defendants were still employed with JPMorgan, Armstrong and Michele contacted and scheduled appointments to meet with the clients to discuss their departure to Wells Fargo and what they could offer there.

11. JPMorgan also has learned that in the days leading up to Defendants' resignations, while they were still employed with JPMorgan, Armstrong and Arikat called several JPMorgan clients and provided their personal cell phone numbers to the clients. On information and belief, Armstrong and Arikat made these calls and provided their personal cell phone numbers to the JPMorgan clients so the JPMorgan clients would be able to contact Armstrong and Arikat after they commenced working at Wells Fargo for the specific purpose of transferring their accounts to Defendants at their new firm.

12.     In addition, on information and belief, Defendants improperly took JPMorgan's confidential client information with them to Wells Fargo, including client contact information, such as cell phone numbers.   The clients' cell phone numbers, without which Defendants would have been unable to call and solicit the clients after they resigned from JPMorgan, on information and belief, are generally not publicly available.

13.     Unfortunately, it appears that Defendants' improper solicitation efforts have proved successful, as approximately 80 JPMorgan client households formerly serviced by Defendants when they were employed by JPMorgan, with assets totaling more than $95 million, already have transferred their accounts to Wells Fargo.

14.     On information and belief, Wells Fargo provided Defendants with substantial financial inducements to join Wells Fargo totaling approximately $6 million, which incentivized Defendants to breach their contractual obligations to JPMorgan.

15.     Defendants' conduct constitutes breaches of the non-solicitation and confidentiality provisions in Defendants' employment agreements and JPMorgan's Code of Conduct and policies, as well as violations of Defendants' common-law obligations to JPMorgan.

16.     To prevent continued irreparable harm arising from Defendants' course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendants from: (i) soliciting JPMorgan's clients and employees, and (ii) continuing to use JPMorgan's Confidential and Proprietary Information, pending resolution of JPMorgan's claims against Defendants in a related arbitration that JPMorgan is in the process of commencing.

## Jurisdiction and Venue

17.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that JPMorgan, on the one hand, and Defendants, on the other hand, are citizens of

different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (b)(2), in that a substantial part of the events giving rise to the claims occurred and continue to occur in Scottsdale, Arizona.

**The Parties**

19.   JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.

20.   JPMorgan provides traditional banking, investment, and trusts and estates services in the Scottsdale, Arizona area through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to better enable the firm to service a wide variety of JPMorgan clients' investment and banking needs.

21.   Defendants are individuals who at all times relevant herein were employed and/or conducted business in Arizona, and they were and are citizens of Arizona. Defendants worked for JPMorgan in offices in Scottsdale, Arizona, and are currently employed by Wells Fargo in an office in Scottsdale, Arizona.

22.   In connection with their employment as registered representatives of JPMorgan, Defendants each executed a Form U-4 Uniform Application for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendants agreed to submit to arbitration before FINRA all disputes, claims and controversies arising between themselves and JPMorgan.  In addition, pursuant to Rule 13200 of the FINRA Code of

Arbitration Procedure for Industry Disputes, the parties to this action are required to arbitrate disputes they have with each other before a panel of arbitrators appointed by FINRA.

## **Factual Allegations**

23.     Armstrong commenced employment with JPMorgan or its predecessors in or about February 2007, when he joined Chase Investment Services Corp. ("Chase Investment"),  then a registered broker-dealer and an affiliate of JPMorgan, and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2007 Armstrong Non-Solicitation Agreement"), which contains provisions prohibiting him from soliciting the firm's clients and employees for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.   A true and accurate copy of the 2007 Armstrong Non-Solicitation Agreement is annexed to the Declaration of RoseAnn Steinmetz (the "Steinmetz Declaration") as Exhibit A.

24.     In 2012, in connection with his promotion to the position of Private Client Advisor, Armstrong entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2012 Armstrong Non-Solicitation Agreement") with JPMorgan.  The 2012 Armstrong Non-Solicitation Agreement contains provisions prohibiting Armstrong from soliciting JPMorgan's clients and employees for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.   A true and accurate copy of the 2012 Armstrong Non-Solicitation Agreement is annexed to the Steinmetz Declaration as Exhibit B.

25.     Arikat commenced employment with JPMorgan or its predecessors in or about February 2010, when she joined Chase Investment and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation

Agreement (the "2010 Arikat Non-Solicitation Agreement"), which contains provisions prohibiting her from soliciting the firm's clients and employees for a one-year period after the termination of her employment and requiring her to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.  A true and accurate copy of the 2010 Arikat Non-Solicitation Agreement is annexed to the Steinmetz Declaration as Exhibit C.

26.    In 2012, in connection with her promotion to the position of Private Client Advisor, Arikat entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan (the "2012 Arikat Non-Solicitation Agreement").   The 2012 Arikat Non-Solicitation Agreement contains provisions prohibiting Arikat from soliciting JPMorgan's clients and employees for a one-year period after the termination of her employment and requiring her to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.  A true and accurate copy of the 2012 Arikat Non-Solicitation Agreement is annexed to the Steinmetz Declaration as Exhibit D.

27.    Rosson, Esparza and Michele, all of whom resigned with Defendants and are currently working with Defendants at Wells Fargo, also entered into agreements with JPMorgan in connection with their employment with the Company, all of which contained provisions prohibiting them from soliciting the firm's clients and employees for a one-year period after the termination of their employment and requiring them to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information.

28.    At the time of their resignations, Armstrong and Arikat were both Private Client Advisors for Chase Wealth Management, working out of separate JPMorgan Chase bank branch offices in Scottsdale, Arizona.  Armstrong worked at the JPMorgan Chase bank branch office located at 18999 E. Shea Blvd. in Scottsdale, Arizona, and Arikat worked at the JPMorgan Chase bank branch office located at 11355 E. Via Linda in

Scottsdale, Arizona.  As Private Client Advisors, JPMorgan Chase referred its bank clients to them, expressly entrusting them to service its clients and build JPMorgan's relationship with them, providing substantial support and guidance to Defendants for that purpose. Armstrong and Arikat sat at their desks at the JPMorgan Chase bank branch they were assigned to and were introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As Private Client Advisors, Armstrong and Arikat were not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.  The vast majority of the clients Armstrong and Arikat serviced at JPMorgan were assigned to them by JPMorgan or were referred to them by JPMorgan Chase.

29.    At the time of their resignations, Esparza and Rosson were both Private Client Bankers for Chase Wealth Management, working in the same JPMorgan Chase bank branch office as Arikat, at 11355 E. Via Linda in Scottsdale, Arizona.  As Private Client Bankers for Chase Wealth Management, Esparza and Rosson worked exclusively on the "bank" side, assisting clients with their banking needs, and referred bank clients to Private Client Advisors, including Arikat, for their investment needs.

30.    On information and belief, Esparza and Rosson sought to leave JPMorgan with Arikat because Esparza and Rosson had frequent contact with many of the JPMorgan clients serviced by Arikat in connection with Esparza and Rosson executing their responsibilities as JPMorgan Private Client Bankers.

31.    At the time of her resignation, Michele was a Private Client Investment Advisor for Chase Wealth Management, working in the same JPMorgan Chase bank branch office as Armstrong, at 18999 E. Shea Blvd. in Scottsdale, Arizona. As a Private Client Investment Advisor, Michele assisted Private Client Advisors (such as Armstrong).

32.     On information and belief, Michele sought to leave JPMorgan with Armstrong because Michele had frequent contact with many of the JPMorgan clients serviced by Armstrong in connection with executing her responsibilities as a JPMorgan Private Client Investment Advisor.

33.     In consideration for entering into and continuing their employment relationships with JPMorgan and executing their agreements with JPMorgan, Defendants were provided with significant benefits, including substantial compensation, office and support facilities, administrative services, securities registration, research, training, advertising and health insurance.

**Defendants' Obligations to JPMorgan**

34.     As noted above, Defendants entered into multiple agreements with JPMorgan or its predecessors that, among other things, contain provisions prohibiting them from soliciting JPMorgan clients and employees for a period of one year after their JPMorgan employment ends, and from using or retaining JPMorgan's Confidential and Proprietary Information.   Defendants' respective Non-Solicitation Agreements are substantially similar, contain nearly identical provisions and are collectively referred to herein as the "Non-Solicitation Agreements."

35.     Section 7(a) of the Non-Solicitation Agreements, entitled "Confidential Information," provides, in relevant part:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business.  Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information").   You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

36.     Section 7(b) of the Non-Solicitation Agreements provides, in relevant part:

In addition to any description contained in the Code of Conduct, . . . Confidential Information . . . includes, but is not limited to:

> *In addition to any description contained in the Code of Conduct, . . . Confidential Information . . . includes, but is not limited to:*
>
> *i.   names, addresses and telephone numbers of customers and prospective customers;*
>
> *ii.  account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*
>
> *iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*
>
> *        *        *
>
> *vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> *        *        *
>
> *viii. information concerning established business relationships;*
>
> *ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

37.     In Section 7(c) of the Non-Solicitation Agreements, Defendants again expressly acknowledge that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information that is confidential and not readily known by competitors, and that must be safeguarded.  All such information, which was provided by

JPMorgan to Defendants for their use in servicing the clients on JPMorgan's behalf, constitutes JPMorgan's Confidential and Proprietary Information.

38.     In Sections 7(d) and 7(e) of the Non-Solicitation Agreements, Defendants agreed to maintain the confidentiality of JPMorgan's Confidential and Proprietary Information, not to disclose it or use it for the benefit of any third-party, and to return it to JPMorgan upon the termination of their employment.

39.     In Section 8 of the Non-Solicitation Agreements, Defendants agreed not to solicit JPMorgan's clients for a one-year period after the termination of their employment:

a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets.  Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

b.  *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and the Chase Private Client platforms.  Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC.  The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors. You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are*

> *not readily available through any public sources and the protection of which represent a legitimate business interest of JPMC.*
>
> c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*

40.     Neither Armstrong, Rosson, Esparza nor Michele had any prior industry experience before joining JPMorgan and, on information and belief, brought no clients with them to JPMorgan.  In fact, they were all permitted to identify all client relationships that they had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restrictions in their agreements.  None of them identified any such pre-existing relationships.  In fact, the "Attachments A" to the 2007 and 2012 Armstrong Non-Solicitation Agreements, which is the space specifically designated for listing such pre-existing relationships, are all blank and list no such pre-existing relationships.  Accordingly, Armstrong is prohibited from soliciting any of the JPMorgan clients he serviced while employed by JPMorgan for a period of one year after his resignation.

41.     Although Arikat had some prior industry experience before joining JPMorgan, on information and belief, she brought few, if any, clients with her to JPMorgan.  Arikat also was permitted to identify all client relationships that she had established prior to commencing employment with JPMorgan in the "Attachment A" to the 2010 and 2012 Arikat Non-Solicitation Agreements, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement. The Attachment A to the 2010 and 2012 Arikat Non-Solicitation Agreements are blank and lists no such pre-existing relationships.  Accordingly, Arikat is prohibited from soliciting any of the JPMorgan clients she serviced while employed by JPMorgan for a period of one year after she resigned.

42.     In Section 9 of the Non-Solicitation Agreements, Defendants agreed not to solicit JPMorgan's employees for a one-year period after the termination of their employment:

> *You understand and acknowledge that JPMC also views its relationships with its employees, offices and consultants as important and valuable assets and considers non-public employee information to be Confidential Information.  Accordingly, in consideration of and as condition of your employment, continued employment, access to trade secrets, Confidential Information, specialized training and mentoring and other consideration provided herein,* ***you understand and agree that a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not, on your own behalf or that of any other persons or entities, directly or indirectly solicit or induce or attempt to solicit or induce to leave or resign from JPMC or to apply for or accept employment or assignment elsewhere: (i) JPMC's current employees, consultants or independent contractors or (ii) any former JPMC employees who resigned from JPMC within twelve months of any such solicitation or inducement.***

43.     In Section 10(a) of the Non-Solicitation Agreements, Defendants agreed that the above-referenced provisions are reasonable, and that they voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.  *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement.  You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*
>
> ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*
>
> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions.  You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

44.     In addition, in Section 10(b) of the Non-Solicitation Agreements, Defendants acknowledge that any breach of the provisions set forth above will cause irreparable harm to JPMorgan, entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreements.

45.     Additionally, in Section 3(b) of the Non-Solicitation Agreements, Defendants agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

46.     Defendants had access to and are bound by JPMorgan's Code of Conduct, which is made available to all employees on the JPMorgan intranet, as it was updated from time to time.  The Code of Conduct has similar confidentiality provisions to those in Defendants' agreements with JPMorgan.

47.     JPMorgan requires employees to annually affirm electronically their agreement to comply with the Code of Conduct.  Both Defendants annually affirmed their agreement to comply with the Code of Conduct, including in 2021 and 2022.

### JPMorgan's Relationship with its Clients and its Confidential and Proprietary Information

48.     As indicated above, JPMorgan gave Defendants the vast majority of the clients they were servicing at the time of their resignations.  The overwhelming majority of clients assigned to Defendants were either pre-existing JPMorgan clients who were reassigned to Defendants, were long-term JPMorgan Chase bank clients who were referred to Defendants, or were developed by JPMorgan and then assigned to Defendants.

49.     JPMorgan has invested substantial time and money, totaling tens of millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, and the bearing of significant risk, that JPMorgan was able to acquire and retain its existing clients.

JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm for many years, often lasting over successive generations, regardless of whether the Private Client Advisor or other team members servicing the clients resign or otherwise leave JPMorgan.  But for Defendants' employment with JPMorgan, they would not have had any contact with the vast majority of the clients the firm assigned to them and whom they are now soliciting.

50.    As part of their official duties at JPMorgan, Defendants had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's assets and investment, banking and trusts and estates needs, and financial goals.  As explained in further detail below, such information – which is not publicly available and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor.

51.    Specifically, during the course of their employment by JPMorgan, Defendants were granted access to JPMorgan's client files containing confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendants had no interaction with the vast majority of the clients they were assigned at JPMorgan (and no knowledge of any of their confidential information) until they started working at JPMorgan and were granted access to the files.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

52.    A critical factor to JPMorgan's continued success is its relationships with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and

has invested untold sums in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendants, for them to use to build the firm's relationships with its clients.

53.    JPMorgan's client list is the lifeblood of its business, and the expenditures incurred by JPMorgan in obtaining and retaining its clients include the tens of millions of dollars spent by JPMorgan every year on national and local advertising and marketing, as well as training and supporting JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its foothold and goodwill in the industry.

54.    JPMorgan also has expended significant resources to service its clients, almost all of whom were assigned or referred to Defendants by JPMorgan Chase.  These resources include tens of millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities, and the risks associated with such expenditures, with no financial contribution from Defendants.

55.    JPMorgan employs reasonable efforts to maintain its Confidential and Proprietary Information, including, but not limited to, its client records.  Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited, employees are required to use a secure password to access their computer terminals and the firm's intranet, and there are constant reminders about the confidential nature of the information contained in the records and the need to protect it.  Employees such as Defendants are repeatedly made aware, and know, that they must maintain the strictly confidentiality of the client

information.  These obligations are confirmed in, among other things, the agreements and policy manual provisions referenced above.

56.    The confidential information that Defendants, on information and belief, have taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third-parties or used for any third-parties' benefit.  Indeed, by law, JPMorgan must safeguard this information until such time as the controlling authorities authorize its release.  Defendants had access to this information solely by virtue of their employment by JPMorgan.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendants were fully aware of, and responsible for, complying with JPMorgan's internal policies, which reflect the legal responsibilities of the firm and its employees regarding confidentiality. JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information.  For example, as is stated above, access to the JPMorgan's computer network by its professionals is password-protected, and JPMorgan limits its client information to certain employees and management who need access to such information to perform their job functions.

**Defendants' Misconduct**

57.    As noted above and incorporated herein, Defendants collectively resigned from JPMorgan on June 15, 2022, without warning, and they immediately joined Wells Fargo.  Defendants began violating their contractual obligations to JPMorgan before they abruptly resigned by beginning to solicit JPMorgan clients to join them at Wells Fargo while they were still employed by JPMorgan, using JPMorgan's Confidential and Proprietary Information, including client contact information and financial histories, for their and Wells Fargo's benefit, and to JPMorgan's detriment.  They continued their improper conduct after commencing their employment with Wells Fargo by continuing to

use JPMorgan's Confidential and Proprietary Information that they improperly retained after they departed.

58.     To date, at least nine JPMorgan clients have informed JPMorgan that Defendants have solicited their business and asked for meetings or appointments with the clients.

59.     Defendants' solicitation of JPMorgan clients is ongoing and continuing.

60.     A review of Defendants' computer activity in the days and weeks leading up to their departure demonstrates that Defendants improperly accessed JPMorgan Confidential and Proprietary Information concerning JPMorgan's clients.

61.     In the days leading up to their departure, Armstrong and Arikat accessed nearly 100 client files on JPMorgan's systems. As Armstrong and Arikat were mere days away from resigning and joining Wells Fargo, there was no legitimate business reason for Armstrong and Arikat to access and view such a large volume of client information.  On information and belief, Armstrong and Arikat accessed these confidential files for the purpose of reviewing and recording certain information for use in their solicitation efforts. Specifically:

- On June 14, 2022, the day before Defendants resigned, 44 client accounts were accessed by Armstrong and Arikat, and for many of them, Armstrong and Arikat accessed the client's information for a very brief period (*e.g.*, one to two minutes) before accessing another client's account;

- On June 13, 2022, two days before Defendants resigned, 36 client accounts were accessed by Armstrong and Arikat, and just as with the accounts reviewed on June 14, for many of them, Armstrong and Arikat accessed at the client's information for a very brief period (*e.g.*, one to two minutes) before accessing another client's account;

- On Sunday, June 12, 2022, three days before Arikat resigned, between 6:52 p.m. and 7:47 p.m. – Arikat accessed 11 client accounts;

- Between June 6 and June 10, 2022, the week before they resigned, when they were undeniably in the process of preparing their departure from JPMorgan, Armstrong and Arikat accessed 81 client accounts; in one instance on June 6, 2022, Arikat accessed 10 client accounts in a four-minute span;

- Several of the clients whose accounts Armstrong and Arikat hurriedly accessed in the days leading up to their resignation had over $1 million in assets under management with JPMorgan.

62.     The screens Armstrong and Arikat were accessing – and on information and belief, taking the information therefrom to Wells Fargo – contained highly confidential client information, including, among other things, client names, home addresses, e-mail addresses, phone numbers, dates of birth, account numbers, account balances and specific investment holdings.

63.     There was no legitimate business reason for Armstrong and Arikat to access and view such client information days prior to their resignation.  On information and belief, Armstrong and Arikat took the information with them from JPMorgan to Wells Fargo (by taking photos of such computer screens with their cell phone, or via some other means), and have used such information at Wells Fargo to solicit JPMorgan clients.

64.     On information and belief, without misappropriating JPMorgan's Confidential and Proprietary Information, Defendants would not have had JPMorgan clients' personal phone numbers or email addresses and would not have had the ability to contact the clients immediately after they resigned.

65.     Defendants' misconduct, as described above, constitutes at a minimum, unfair competition, breach of Defendants' contracts, breach of Defendants' fiduciary duties and duties of loyalty, misappropriation of trade secrets, violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq., violation of the Arizona Uniform Trade Secrets Act, A.R.S. §§ 44-401, et seq., tortious interference, and conversion.  Unless Defendants' conduct is immediately enjoined, Defendants will remain emboldened and will continue to engage in their rampant misconduct, and JPMorgan's other employees will be encouraged to engage in the same improper conduct.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

66.     By unfairly competing and seeking to improperly solicit JPMorgan's clients and employees, Defendants have and will continue to cause continuing and irreparable injury to JPMorgan, for which there is no adequate remedy at law.   Defendants' wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

     a.  Loss of JPMorgan clients and client confidence;

     b.  Injury to JPMorgan's reputation and goodwill in the Scottsdale, Arizona market;

     c.  Improper retention, use and disclosure of JPMorgan's Confidential and Proprietary Information, including client-related information;

     d.  Damage to office morale and stability, and the undermining of office protocols and procedures; and

     e.  Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

67.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 66 hereof.

68.     Defendants breached their contracts and agreements with JPMorgan by soliciting JPMorgan's clients and employees and by, on information and belief, taking and using JPMorgan's confidential documents and information.   By soliciting JPMorgan's clients and employees and using and disclosing JPMorgan's proprietary and confidential information, Defendants seek to convert to their benefit JPMorgan's protectable interests.

69.     JPMorgan performed all of its duties under the contracts or agreements.

70.   JPMorgan has been injured and will continue to be injured by Defendants' breaches of their agreements with JPMorgan in an amount which cannot readily be ascertained or compensated by money damages.

71.   As a direct and proximate result of Defendants' breaches of their agreements, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets and Confidential Information)**

72.   JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 71 hereof.

73.   JPMorgan's confidential and proprietary business and client information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.   JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.   JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and client information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.   Accordingly, JPMorgan's confidential and proprietary business and client information constitutes protectible trade secrets and confidential information under common law.

74.   As a direct and proximate result of Defendants' misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable

injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### THIRD CAUSE OF ACTION

### (Conversion)

75.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 74 hereof.

76.     At all times JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and confidential and proprietary information and all physical embodiments thereof.

77.     JPMorgan is informed and believes that Defendants took or retained JPMorgan's trade secrets and confidential and proprietary information, including, but not limited to, confidential client contact and financial information, and converted such information for the use of Defendants and those acting in concert with them.

78.     Defendants' continued detention and use of JPMorgan's trade secrets and confidential and proprietary information constitutes conversion.

79.     As a direct and proximate result of Defendants' conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

80.     JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 79 hereof.

81.     As employees of JPMorgan, Defendants owed JPMorgan fiduciary duties of good faith, trust and loyalty.

82.     Defendants' fiduciary duties required them at all times to, among other things, act in JPMorgan's best interests and not act on behalf of competing third-parties, and maintain the confidentiality of JPMorgan's trade secrets and confidential and proprietary information.  Defendants' fiduciary duties also required them at all times to refrain from, among other things, improperly soliciting JPMorgan's clients and employees to join them at a competing company.

83.     Defendants breached their fiduciary duties to JPMorgan by engaging in the conduct alleged above.  Defendants began engaging in such wrongdoing while they were still employed by JPMorgan, prior to and upon planning their resignations from JPMorgan, and they continued the wrongdoing after joining Wells Fargo.

84.     Defendants knew and intended, or knew and recklessly or negligently disregarded, that their acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

85.     As a direct and proximate result of Defendants' breaches of their fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FIFTH CAUSE OF ACTION**

**(Breach of Duty of Loyalty)**

86.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 85 hereof.

87.     By virtue of their positions with JPMorgan, Defendants owed JPMorgan a duty of undivided loyalty during the term of their employment with JPMorgan. Defendants' duty of loyalty prohibited them from competing with JPMorgan or assisting a competing business during the course of their employment with JPMorgan.  Defendants'

duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

88.     Defendants breached their duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of their employment with JPMorgan.

89.     Defendants knew and intended, or knew and recklessly or negligently disregarded, that their acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

90.     As a direct and proximate result of Defendants' breach of their duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION

### (Intentional and/or Negligent Interference with

### Actual and Prospective Economic Advantage and Business Expectancy)

91.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 90 hereof.

92.     JPMorgan has developed and maintains advantageous actual and prospective business relationships and business expectancies with respect to its clients and employees that promise a continuing probability of future economic benefit to JPMorgan.

93.     JPMorgan is informed and believes, and on that basis alleges, that Defendants knew or reasonably should have known about JPMorgan's advantageous

actual and prospective business relationships and business expectancies with respect to its clients and employees.

94.     JPMorgan is informed and believes, and on that basis alleges, that Defendants have intentionally or negligently interfered with, and continue to interfere with, JPMorgan's business relationships and business expectancies with respect to its clients and employees by, among other things, directly and/or indirectly attempting to induce JPMorgan clients and employees to sever their relationships with JPMorgan and to do business with them at Well Fargo.

95.     There was no privilege or justification for Defendants' conduct.  Moreover, Defendants' actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of fiduciary duty.

96.     Defendants' conduct was and continues to be improper, willful, and malicious.

97.     As a direct and proximate result of Defendants' tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SEVENTH CAUSE OF ACTION

### (Unfair Competition)

98.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 97 hereof.

99.     Respondents' conduct as set forth above and incorporated herein is unlawful, unfair and deceptive, and it constitutes unfair competition.

100.   JPMorgan is informed and believes, and on that basis alleges, that Defendants were fully aware, or should have been aware, that the misconduct they engaged in would cause JPMorgan to lose clients that it expended great deals of time, effort and money to develop, and who would have been unknown to Defendants had JPMorgan not introduced Defendants to them.

101.   As a direct and proximate result of Defendants' unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction restraining Defendants from engaging in further wrongful conduct.

## EIGHTH CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*)

102.   JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 101 hereof.

103.   JPMorgan's trade secrets and confidential and proprietary information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop such information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its trade secrets and confidential and proprietary information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.  Accordingly, JPMorgan's trade secrets and confidential and proprietary information constitutes trade secrets pursuant to the Defend Trade Secrets Act.

104.     JPMorgan's trade secrets are related to a service used in, or intended for use in, interstate or foreign commerce. Defendants misappropriated JPMorgan's trade secrets by utilizing the information to contact and solicit JPMorgan clients to transfer their assets and business to them at Wells Fargo. Defendants have engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of its agreements and policies prohibiting such conduct.  Defendants engaged in this conduct despite the fact that they knew or had reason to know that their knowledge of JPMorgan's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

105.     As a direct and proximate result of Defendants' misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### NINTH CAUSE OF ACTION

### (Violation of the Arizona Uniform Trade Secrets Act, A.R.S. §§ 44-401, *et seq*.)

106.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 105 hereof.

107.     JPMorgan's trade secrets and confidential and proprietary information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop such information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its trade secrets and confidential and proprietary information, including, but not limited to, restricting access to

such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's trade secrets and confidential and proprietary information constitutes trade secrets pursuant to the Arizona Uniform Trade Secrets Act.

108. Defendants misappropriated JPMorgan's trade secrets by utilizing the information to contact and solicit JPMorgan clients to transfer their assets and business to them at Wells Fargo. Defendants have engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of its agreements and policies prohibiting such conduct. Defendants engaged in this conduct despite the fact that they knew or had reason to know that their knowledge of JPMorgan's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

109. As a direct and proximate result of Defendants' misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, Plaintiff respectfully requests that a judgment be entered in its favor against Defendants as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly-appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendants, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Wells Fargo, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendants at JPMorgan or whose names became known to Defendant by virtue of their employment with JPMorgan (or its predecessors in interest);

(b) soliciting any employee of JPMorgan, inducing or attempting to induce any employee of JPMorgan to join Wells Fargo, or taking any action to assist Wells Fargo in soliciting or hiring any employee of JPMorgan, or inducing or attempting to induce any employee of JPMorgan to leave JPMorgan; and

(c) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.     Ordering Defendants, and all those acting in concert with them, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendants or their counsel of the terms of such an order.

C.     For an award of attorneys' fees and costs under the aforementioned contracts and/or A.R.S. § 12-341.01 and A.R.S. § 12-341.

D.     Such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 21st day of July, 2022.

GALBUT BEABEAU, P.C.


By:/s/ Olivier A. Beabeau
Olivier A. Beabeau
Grant H. Frazier

PADUANO & WEINTRAUB LLP


Leonard Weintraub
Attorneys for Plaintiff